Pamella E. SETTLEGOODE,
Plaintiff–Appellant,

v.

PORTLAND PUBLIC SCHOOLS, Mult-
nomah School District No.1; Susan
Winthrop; Robert Crebo; Larry Whit-
son, Defendants–Appellees.

No. 02–35260.

United States Court of Appeals,
Ninth Circuit.

Argued Oct. 7, 2003.

Submitted April 5, 2004.

Filed April 5, 2004.

Amended June 9, 2004.

513 U.S. 18, 29, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994).

Our opinion is not moot and we decline to vacate it.

504

Charles J. Merten, Portland, OR, argued for the plaintiff-appellant.

Bruce L. Campbell, Portland, OR, argued for the defendants-appellees.

Before D.W. NELSON, KOZINSKI and McKEOWN, Circuit Judges.

ORDER AND AMENDED OPINION

**ORDER**

The opinion in this case is amended as follows:

Slip op. 4201, Line 11:

Insert "most of" before "the issues"

Slip op. 4201, Lines 15–16:

Delete "In other words, the section 1983 claim is both necessary and sufficient to sustain the jury's full verdict."

Slip op. 4205, Line 19:

Insert the following as a new footnote 6 at the end of the paragraph:

"The magistrate also granted judgment as a matter of law on Settlegoode's Rehabilitation Act claim based on Settlegoode's inability to write adequate IEPs. *Settlegoode,* CV–00–313–ST, at 25–26. There is some dispute as to which of the parties had the burden of proof under the Rehabilitation Act. Because we find the evidence about Settlegoode's IEPs entirely unconvincing in light of the demanding Rule 50 standard, and Settlegoode offered evidence that her IEPs had hardly been altered by her supervisors and that IEPs are easily criticized, the jury's verdict under the Rehabilitation Act is amply supported by the record, regardless of where the burden of proof falls.

We also reverse the magistrate's grant of a new trial based on insufficiency of the evidence for the reasons stated above."

The remaining footnotes are re-numbered accordingly.

Slip op. 4206, n. 7 (formerly n. 6), Line 6:

Insert ", in part," before "was concerned"

Slip op. 4206, n. 7 (formerly n. 6), Lines 12–16:

Replace "Once the case has proceeded to trial, these concerns fall by the wayside and the *Saucier* sequence is inapplicable. The court, rather, may decide the issues in whatever order it believes would serve the interests of justice in light of the then-existing circumstances."

with

"Once the case has proceeded to trial, these concerns fall by the wayside and the sequence in which the court decides the two issues is no longer important. Although the court must still decide both issues, it may do so in whatever order it believes would serve the interests of justice in light of the then-existing circumstances."

Slip op. 4212, Line 12:

Replace "Because we hold" with "We hold"

Slip op. 4212, Line 14:

Insert "against Winthrop and Crebo" after "1983 claims"

Slip op. 4212, Lines 14–15:

Delete ", we need not address her other claims"

Slip op. 4212, Line 17:

Insert the following as a new footnote 11 after "under section 1983.":

"Settlegoode failed to challenge the magistrate's holding that the School Board could not be held liable under section 1983 because Settlegoode did not prove ratification or a pattern and practice, as required by *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *See Settlegoode*, CV–00–313–ST, at 35. Thus, we affirm the district court's grant of judgment as a matter of law with respect to the section 1983 claims against the School Board. However, because we also find the School Board liable under the Rehabilitation Act, *see* note 6 *supra*, it is still liable for compensatory damages. *See Duvall v. County of Kitsap*, 260 F.3d 1124, 1141 (9th Cir.2001) (*Monell* only applies to section 1983 claims, and not to Rehabilitation Act claims, which are governed by respondeat superior); *Bonner v. Lewis*, 857 F.2d 559, 566–67 (9th Cir.1988) (municipalities are not exempted from respondeat superior liability under the Rehabilitation Act)." The remaining footnotes are re-numbered accordingly.

The petition for rehearing is otherwise denied and the petition for rehearing en banc is rejected. Fed. R.App. P. 35; Fed. R.App. P. 40. No further petitions for rehearing or rehearing en banc will be accepted. The mandate shall issue forthwith.

## OPINION

KOZINSKI, Circuit Judge:

We consider the standard of review applicable to various post-trial motions following a jury verdict.

### Facts

Many facts were hotly disputed at trial. We state them here consistent with the verdict.

Dr. Pamella Settlegoode was hired by Portland Public Schools as an Adapted Physical Education teacher for the 1998–99 academic year on a probationary basis. Hired to teach students with disabilities in various schools in the district, she was an itinerant teacher and therefore conducted her physical education classes at two or three different schools each day. Her job included teaching the disabled students as well as drafting individualized education programs (IEP) for them, as mandated by federal law. *See* 20 U.S.C. § 1414(d).

Settlegoode soon became concerned about the way disabled students were treated in the Portland schools. She had trouble finding a place to teach her high school students; material and equipment were often lacking, inadequate or unsafe. Settlegoode tried to talk to her immediate supervisor, Susan Winthrop, about these problems. Winthrop told Settlegoode that she was the only one who had ever complained about the facilities for disabled students, and Winthrop frequently attempted to change the subject. At the end of her first year of teaching, Settlegoode wrote Winthrop's supervisor, Robert Crebo, a ten-page letter expressing her concern that the Adapted Physical Education program suffered from problems of "[s]ystematic discrimination, maladministration, access, pedagogy, curriculum, equity and parity," and "greatly compromised" federal law. E.R. at 132. She described her negative experiences in several different schools in the district, comparing the treatment of disabled students to that of black students before the Civil Rights Movement. "In sum," she wrote, "these sketches offer a portraiture of a form of education that is . . . all too familiar in this country. It wasn't all that long ago when Black African Americans took a back seat on the American School bus (though in Portland, there's still lots of 'Separate, but equal' to go around)." *Id.* at 141. Settle-

goode also criticized Winthrop in this letter, claiming that Winthrop was dismissive of Settlegoode's concern for her students, and that Winthrop was too tied to the school bureaucracy to be in touch with the needs of disabled students.

Crebo gave Settlegoode's letter to Winthrop for comment. Winthrop replied with a memo to Crebo stating: "It is of concern to me that a staff member with such limited experience has the potential to defame my character and damage my professional reputation." *Id.* at 144. Winthrop ended with, "I appreciate your support in this." *Id.* Crebo then asked Winthrop to draft a response to Settlegoode's letter and to investigate Settlegoode's accusations. In the meantime, Winthrop told Settlegoode to stop writing letters, because it was not "an effective means of communicating." S.E.R. at 61.

Crebo's response to Settlegoode's letter defended Winthrop and the school district's treatment of disabled students. The letter ended by stating: "It is puzzling to me that with this limited experience you've made such critical comments about our system. It is unfortunate that you are so dissatisfied with your teaching position in Portland Public Schools." *Id.* at 155.

During Settlegoode's first year of teaching, her performance evaluations were generally positive. In all categories, Winthrop wrote that Settlegoode's performance met minimum standards. She elaborated that Settlegoode's instruction was "well planned, appropriate, and of high interest." *Id.* at 222. She also wrote that Settlegoode "is supportive of students, giving them good feedback and treating them with respect," and that she "has creative ideas and effectively uses unique materials to enhance activities." *Id.* With regard to

the preparation of IEPs for her students, Winthrop explained that, "Ms. Settlegoode is working to develop her skills in writing IEP goals and objectives which are measurable. She has not yet had opportunities to prepare evaluation reports." *Id.*

Winthrop's evaluations after Settlegoode's letter were much more negative. Settlegoode no longer met minimum standards of performance in several areas, including IEP writing, behavior management practices, ability to maintain maximal instruction time for students, ability to interact positively with administrators, supervisors and colleagues, and ability to interact positively with parents and students. Winthrop noted in the evaluations that Settlegoode "is not writing IEP goals which are measurable nor is she establishing baseline data in the Present Level of Education Performance (PLOP). IEP objectives do not consistently include specific student behavior and measurable criteria." *Id.* at 232.[1] Winthrop also wrote that Settlegoode was "strong, outspoken, and demanding," and that she was "not able to listen to constructive criticism, complete a self reflective process, and improve professional behavior." *Id.* at 235. The evaluation ended by stating that, "[i]f Dr. Settlegoode's work continues at its present quality, renewal of contract for another year cannot be recommended." *Id.* at 237.

Settlegoode next wrote a fifteen-page letter to Dr. Ben Canada, the superintendent of Portland Public Schools, claiming that she was being retaliated against for complaining about the treatment of her students. She also reiterated her contention that the facilities for disabled students

---

1. An IEP begins by measuring the student's present level of performance—affectionately known as PLOP—which provides a benchmark for measuring the student's progress toward the goals stated in the IEP.

in the school district were inadequate. She claimed these conditions were "discriminatory." *Id.* at 172. Canada testified that "at that point ... [c]ounsel [was] involved." *Id.* at 335.

Crebo then responded to Settlegoode's letter to Canada. He wrote:

I want you to understand, clearly, that I am not going to respond to your issues, accusations and subjective characterizations of situations and other professionals.

As your Supervisor, Susan Winthrop, has indicated to you these long, written communications are not an effective way to deal with issues. In fact, you have been directed to discontinue this practice and meet with your supervisor to discuss any issues about which you are concerned.

There is one assertion that you make in your most recent 15 page letter to Dr. Canada that is very troubling to me to which I will respond. You assert that your "reporting of events has reaped professional retaliation" and you assert further that this retaliation continues. This allegation is absolutely without merit. Ms. Winthrop will continue to perform her duties as your Supervisor which is to provide you with honest and direct feedback on your job performance.

*Id.* at 177.

Crebo also wrote a memo to Canada, saying that it was "likely that ... [Settlegoode] will not be recommended for renewal." *Id.* at 178. The memo explained that Settlegoode had been "writing lengthy letters to her supervisor and the Director of Special Education that were hostile, accusatory, and demanding," and that she

had been "highly critical of special education services, administrators, and other staff." *Id.* The memo also discussed Settlegoode's difficulty in communicating with her colleagues and managing groups of students, and her lack of responsiveness to constructive feedback. *Id.*

Settlegoode's final evaluation noted improvement in some areas, but stated that she was still deficient in writing IEPs, that her communication with others "continues to be difficult," and that she had problems monitoring groups of students. *Id.* at 240–44. It also stated that her performance fell below district standards and that her contract would not be recommended for renewal. *Id.* at 245. The School Board then met about whether to renew Settlegoode's contract and decided not to. S.E.R. at 198.

Settlegoode brought suit against the Portland Public Schools, Winthrop and Crebo, alleging that defendants violated section 504 of the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978, 29 U.S.C. § 794, Settlegoode's First Amendment free speech rights under 42 U.S.C. § 1983, and Oregon's Whistleblower Act, ORS 659A.200 .224.[2] A jury found for Settlegoode on all claims and awarded her $500,000 in non-economic damages and $402,000 in economic damages. In addition, the jury awarded $50,000 in punitive damages against both Winthrop and Crebo under section 1983.

The magistrate judge granted defendants' motion for judgment as a matter of law on all three causes of action, and held that Winthrop and Crebo were entitled to qualified immunity on the section 1983 claim. The magistrate also granted defen-

---

**2.** Settlegoode voluntarily dismissed her claim under the Equal Pay Act, 29 U.S.C. § 206(d), her defamation claim and all claims against

Larry Whitson, another administrative supervisor for Portland Public Schools.

dants' motion for a new trial because she found Settlegoode's counsel had engaged in misconduct. Not surprisingly, Settlegoode appeals.

## Analysis

■ A district court may set aside a jury verdict and grant judgment as a matter of law "only if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir.2001); Fed. R.Civ.P. 50(b). When evaluating such a motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

*Merits*

We consider plaintiff's section 1983 claim first because, if she succeeds, most of the issues pertaining to the remaining claims become redundant and therefore moot. The section 1983 claim, moreover, is the only one supporting punitive damages and we must therefore address it at some point, regardless of the other claims.

■ 1. When a government employee alleges that he has been punished in retaliation for exercising his First Amendment rights, we engage in a three-part inquiry: To prevail, an employee must prove (1) that the conduct at issue is constitutionally protected, and (2) that it was a substantial or motivating factor in the punishment. Even if the employee discharges that burden, (3) the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct. *Keyser v. Sacramento Unified Sch. Dist.*, 265 F.3d 741, 750 (9th Cir.2001). The magistrate judge found that Settlegoode "presented substantial evidence that the content of her speech reporting violations of the law by the District was a factor ... for the nonrenewal decision," *Settlegoode v. Portland Public Schools*, CV 00–313–ST, slip op. at 30 (D.Or. Jan. 31, 2002), but held that defendants prevailed on the third element of the *Keyser* test. According to the magistrate judge:

> [T]he absence of defendants' liability is clear.... [E]ven if plaintiff had not complained of matters related to the treatment of special education students, the District proved, without any contrary evidence by plaintiff, that *her inability to write IEPs was sufficient for it to deny renewal of her probationary contract.* Thus, the District would have taken the same action even in the absence of protected speech.

*Id.* at 38 (emphasis added).

The inadequacy of Settlegoode's IEPs, however, is not nearly as clear as the magistrate judge seemed to believe. The only documentary evidence that Settlegoode's IEPs were inadequate consists of Winthrop's evaluations, which were written after Settlegoode had sent her first letter criticizing her and the school district. Winthrop also criticized Settlegoode's IEPs in her testimony but, as the magistrate judge recognized, the jury could have disregarded her testimony because of her interest in the case. *Reeves*, 530 U.S. at 151, 120 S.Ct. 2097. The only other evidence concerning Settlegoode's ability to write IEPs came from Carol Matarazzo, the former Assistant Superintendent of Portland Public Schools. Matarazzo, however, testified that she never even saw Settlegoode's IEP drafts, nor made any independent evaluation of Settlegoode's performance. She also admitted that she was "not directly involved in the evaluation of probationary teachers," Tr. of

Trial at 1390 (No. CV 3–00–313 ST) (Nov. 14, 2001), and that all of her "impressions" of Settlegoode were based on reading Winthrop's evaluations. *Id.* at 1391. When asked about her participation in the decision not to renew Settlegoode's contract, she explained: "I read through all of ... [Winthrop and Crebo's] evaluations and talked to Ms. Winthrop, her supervisor, and to Bob Crebo" before deciding that Settlegoode would not be able to be "a satisfactory teacher." *Id.* at 1395. This would hardly allow Matarazzo to form an independent opinion of Settlegoode's ability to draft acceptable IEPs. Thus, evidence of Settlegoode's deficiencies in writing IEPs hinged entirely on Winthrop's word, which the jury was certainly entitled to disregard.

At the same time, there is no evidence that defendants discarded or even substantially revised Settlegoode's IEP drafts. Writing IEPs is a dynamic, collaborative process, one that involves a group of parents, teachers and administrators working together to prepare an education program suitable for a disabled child. *See* 20 U.S.C. § 1414(d)(1)(B). No single teacher writes an IEP alone. A teacher may draft a section of the IEP, but ultimately that section is evaluated by the IEP team and incorporated into an overall program for the student. IEPs are mandated by federal law and create legally enforceable rights and obligations that bind the district and the pupil for at least an entire school year. *See id.* § 1414(d)(2). A school district thus has both the legal obligation and the incentive not to import a poorly drafted section into an IEP. One would expect that a truly inadequate IEP would be substantially criticized, revised or discarded.[3] As one administrator testified, in the Portland schools, inappropriate or substandard IEPs were noted at IEP meetings and corrected. E.R. at 431–32.

Yet the only evidence that anyone ever altered one of Settlegoode's IEPs came from Larry Whitson, who testified that he changed a single page of one of Settlegoode's IEPs recommending Tai Chi for a student. Whitson's changes, however, did not reflect Settlegoode's inability to write IEPs with measurable goals—the main criticism listed in her evaluations—but concerned a substantive disagreement about whether Tai Chi was an appropriate skill for a disabled child to learn.[4] Whitson never said Settlegoode's IEP was objectively inadequate or failed to include measurable goals. No other evidence was presented at trial that Settlegoode's IEPs were found to be defective during the IEP process.

Settlegoode presented this argument to the magistrate judge, who rejected it, explaining:

[P]laintiff reasons that if her IEPs were crucial for her, then they were equally crucial for the students. Thus, if they were as inadequate as Winthrop claims, then defendants would have produced evidence that they disregarded them or corrected them by calling another IEP

---

3. As former Assistant Superintendent Matarazzo explained, "[t]he [IEP] is the linchpin of Special Education.... [I]f you don't meet the expectations in the IEP you have to provide compensatory services and make sure you get it accomplished. So having a well-written, accurate, appropriate Individualized Education Plan is essential." Tr. of Trial at 1391–92 (No. CV 3–00–313–ST) (Nov. 14, 2001).

4. Whitson explained: "[T]he IEP team decided that we would write a page for Adapted P.E. that said that [the disabled student] would learn skills in three new ... recreation areas. It did not rule out teaching Tai Chi. It just allowed us ... to have a discussion about whether or not that would be appropriate." Tr. of Trial at 1037–38 (No. CV 3–00–313–ST) (Nov. 13, 2001).

meeting. *This argument improperly attempts to shift the burden of persuasion from plaintiff to defendants.*

*Settlegoode,* CV 00–313–ST, at 15 (emphasis added). However, it is clear that the burden in section 1983 claims is, indeed, on defendants to show that they "would have taken the same action even in the absence of the protected conduct." *Keyser,* 265 F.3d at 750.

Even if defendants had shown that Settlegoode's IEPs were inadequate, that still would not have been enough under *Keyser.* Defendants were required to show that they "*would* have taken the same action even in the absence of the protected conduct." *Id.* (emphasis added). Proof that Settlegoode's IEPs were deficient only tells us that the school district *could* have chosen not to renew Settlegoode's contract for reasons independent of the protected conduct. The magistrate judge said almost nothing about this distinction, but it is a crucial one. Defendants, for example, offered no evidence that other teachers had been fired for drafting inadequate IEPs in the past or that it was unusual for new teachers to struggle with IEP writing. To the contrary, two teachers in Settlegoode's department testified that drafting IEPs is difficult, that it is easy to criticize any IEP and that IEPs would be a good place "to create a paper trail." Tr. of Trial at 133 (CV 3–00–313–ST) (Nov. 6, 2001). As the burden is on the defendants to

show Settlegoode's contract would not have been renewed, even if she had kept silent, we cannot agree with the magistrate judge that they made a sufficient showing under *Keyser.*

The jury specifically found, as indicated on the verdict form, that defendants did not "prove[ ] by a preponderance of the evidence that they would not have renewed Dr. Settlegoode's contract for reasons other than Dr. Settlegoode's protected speech." E.R. at 637. In bringing their Rule 50 motion for judgment notwithstanding the verdict, defendants must vault a very high hurdle: They must show that no reasonable juror could have found that the school district *would* have renewed her contract but for her speech. At best, they have shown that whether Settlegoode's inadequate IEPs were the reason for her termination, or whether they were inadequate in the first place, is a close call.[5] In such circumstances, the rule is clear: The verdict trumps.[6]

■■■ **2.** The magistrate judge also held that defendants Winthrop and Crebo are entitled to qualified immunity under section 1983. Public officials are immune from liability for section 1983 damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzger-*

---

**5.** We have considered the magistrate judge's in-depth analysis, including side-by-side comparisons of Settlegoode's and model IEPs. That the magistrate judge had to work so hard in reaching her conclusion alone suggests that this is not the kind of clear-cut case that warrants overturning the jury's verdict.

**6.** The magistrate also granted judgment as a matter of law on Settlegoode's Rehabilitation Act claim based on Settlegoode's inability to write adequate IEPs. *Settlegoode,* CV–00–313–ST, at 25–26. There is some dispute as to which of the parties had the burden of proof

under the Rehabilitation Act. Because we find the evidence about Settlegoode's IEPs entirely unconvincing in light of the demanding Rule 50 standard, and Settlegoode offered evidence that her IEPs had hardly been altered by her supervisors and that IEPs are easily criticized, the jury's verdict under the Rehabilitation Act is amply supported by the record, regardless of where the burden of proof falls.

We also reverse the magistrate's grant of a new trial based on insufficiency of the evidence for the reasons stated above.

*ald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Where plaintiff is a government employee claiming violations of his First Amendment rights, he must show that two things were clearly established: (1) that his speech involved a matter of public concern, and (2) that the interests served by allowing him to express himself outweighed the state's interest in promoting workplace efficiency and avoiding workplace disruption. *Keyser,* 265 F.3d at 747; *see also Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (announcing the balancing requirement for First Amendment claims in the context of government employment).[7] When balancing interests under the second prong of the test, defendants must show " 'actual injury to … legitimate interests' beyond the 'disruption that necessarily accompanies' such speech." *Keyser,* 265 F.3d at 749 (quoting *Johnson v. Multnomah County,* 48 F.3d 420, 427 (9th Cir.1995)). The magistrate judge found that "plaintiff's speech [was] within the ambit of the First Amendment," and thus was a matter of public concern, *Settlegoode,* CV–00–313–ST, at 30, but held that the balancing of interests under the second prong of the qualified immunity test did not weigh clearly in Settlegoode's favor. The magistrate erred once again.

The magistrate judge started off on the wrong foot by failing to acknowledge the jury's determination of this issue, and thus did not consider the qualified immunity question in light of the demanding Rule 50 standard. The jury here was properly instructed that, "[b]ecause some anger or unhappiness necessarily accompanies speech on issues of public concern, Defendants must prove that the School District suffered an actual injury to its legitimate interests beyond mere disruption of the workplace." E.R. at 540. The jury was also given the appropriate list of factors to consider in making this determination, including "whether Dr. Settlegoode's protected speech impeded the School District's abilities to perform its duties efficiently; … the manner, time and place of her protected speech; and … the context in which she made the protected speech." Tr. of Trial at 1539–40 (No. CV 3–00–313–ST) (Nov. 15, 2001).

In light of these instructions, the jury's verdict in favor of Settlegoode necessarily reflected a finding that any disruption her comments might have aroused was outweighed by Settlegoode's interest in free expression. Thus, under Rule 50, the magistrate judge should only have found that defendants were protected by qualified immunity if it was " 'quite clear that the jury … reached a seriously erroneous result.' " *Ace v. Aetna Life Ins. Co.,* 139 F.3d 1241, 1248 (9th Cir.1998) (quoting

---

7. In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court held that this inquiry must be made in two successive steps: The court must first determine whether "the facts alleged show the officer's conduct violated a constitutional right"; "the next, sequential step is to ask whether the right was clearly established"— an inquiry that "must be undertaken in light of the specific context of the case." *Id.* at 201, 121 S.Ct. 2151. *Saucier,* in part, was concerned with " 'avoid[ing] excessive disruption of government and permit[ting] the resolution of many insubstantial claims on summary judgment,' " *id.* at 202, 121 S.Ct. 2151 (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727), and thus established an analytic framework that would enhance the likelihood that claims will be resolved at " 'the earliest possible stage in litigation,' " *id.* at 201, 102 S.Ct. 2727 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)). Once the case has proceeded to trial, these concerns fall by the wayside and the sequence in which the court decides the two issues is no longer important. Although the court must still decide both issues, it may do so in whatever order it believes would serve the interests of justice in light of the then-existing circumstances.

*EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir.1997)).

■ We cannot see how the jury's finding could possibly be deemed "seriously erroneous." There was a strong interest in allowing Settlegoode to express herself. Not only were Settlegoode's core First Amendment rights implicated, but her speech may have had important effects for the disabled students in the district and their parents. Teachers are uniquely situated to know whether students are receiving the type of attention and education that they deserve and, in this case, are federally entitled to. We have long recognized "the importance of allowing teachers to speak out on school matters," *Connick v. Myers*, 461 U.S. 138, 162, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), because " '[t]eachers are, as a class, the members of a community most likely to have informed and definite opinions' " on such matters, *id.* (quoting *Pickering*, 391 U.S. at 572, 88 S.Ct. 1731). This is particularly so with respect to disabled children, who may not be able to communicate effectively that they lack appropriate facilities. Teachers may therefore be the only guardians of these children's rights and interests during the school day. Whether or not Settlegoode's assertions were accurate, or were communicated in the best manner possible, it is clear that the subject matter of her expression was of public importance.

At the same time, the school district presented very little evidence of disruption. Settlegoode's method for conveying her dissatisfaction with the adapted physical education program included sending internal letters and discussing the issue with supervisors. She made her concerns known through proper channels, and made no public statements about the school conditions. *See Gilbrook v. City of Westminster*, 177 F.3d 839, 868 (9th Cir.1999) (a factor to consider when balancing interests under *Pickering* is "whether the speaker directed the statement to the public or the media, as opposed to a governmental colleague"). We are hard pressed to figure out what Settlegoode could have done that would have been more pleasing to the school district—except, of course, keep quiet.

Moreover, none of the testimony on which the magistrate judge relied shows "actual injury" to the district or to the adapted physical education program in any of the schools. Several teachers said they were hurt or upset by Settlegoode's letter, as one would expect in these circumstances, but there was no evidence that the letter had a "devastating effect . . . on the cohesion of the APE teachers," as the magistrate judge found. *Settlegoode*, CV–00–313–ST, at 33. Gail Reynolds, a teacher in Settlegoode's department, testified that she was "furious," "[o]utraged," and "[u]pset" by the letter, but never described any actual injury to the department. S.E.R. at 94. In fact, she described just the opposite: after the letter, the department called a meeting "to talk about positive outcomes, and how we were going to work together as a team and go forward from here." *Id.* at 95.[8]

A second teacher, Jan Standlea, testified that she was "surprised" by Settlegoode's letter, E.R. at 464, but the rest of her testimony merely confirmed what Reynolds had said—that the letter prompted

---

**8.** It is highly doubtful, in any event, that an adverse reaction of those who are the subject of criticism could sustain a finding of actual injury. It is the nature of criticism that few welcome it and even fewer recognize it as justified. Nevertheless, receiving criticism— even unjust criticism—with grace is part of the job of being a public servant, and if unhappiness with criticism causes job disruption, this may be the fault of those being criticized rather than those doing the criticizing.

the teachers to discuss how better to cooperate with each other and how to improve physical education for disabled students. She explained in great detail the meeting that was held in response to the letter:

Q. Were there ground rules for this meeting?

A. Yes, there were .... we established some ground rules with the group on some things, such as not talking over other people, and letting other people say what they needed to say.

And we went through a process where people—each person had one minute to discuss their negative reactions to the paper. And then they had one minute to discuss the positive reaction to the paper.

And then we did some brainstorming of some ways in which we could come together as a team.

Q. Would you look at Exhibit 101?

A. Yes.

Q. Was this something that resulted from the meeting that you've been telling the jury about?

A. Yes, these are the notes that Michelle Chevallier typed up after our meeting was over with the results of our meeting.

Q. Why aren't there negative comments on this document?

A. Because part of this—the main reason for this meeting was to have—develop some group cohesion, so we didn't want to dwell on the negatives. So when the negatives were talked about in the meeting they were not written down.

So the negative was not to be focused on, to get it out and have that go.

And then when we talked about the positive aspects those were written down because we wanted this to be a positive outcome.

E.R. at 465–66.

The meeting notes further demonstrate that Settlegoode's letter brought the teachers together to help make positive changes to their department and the physical education program, and that many of the teachers agreed with Settlegoode. The notes describe the "[m]any legitimate issues" mentioned in the letter, such as "[a]ccessibility" and "[e]quipment needs," and say that Settlegoode "has a lot of 'guts'" and that the letter "will help us pull together, now we are on 'the same page.'" *Id.* at 248. A reasonable jury could have found that Settlegoode's letter was harmonizing, rather than disruptive.[9]

The administrators who testified also failed to show that Settlegoode's letter was unusually disruptive or caused actual injury. Most of the administrators' testimony commented on Settlegoode's communication style, and reflected frustration with being criticized in such a pointed manner. For example, the principal of the high school said she wanted Settlegoode "out of my building, out of Franklin High School," *id.* at 472, because Settlegoode "did not understand how a high school worked," *id.* at 469. The same principal elaborated that Settlegoode made "charges against ... my staff" and "made demands that they could not fulfill." *Id.* at 471. She described her relationship with Settlegoode as "strained." *Id.* at 473. Nothing in her testimony, however, offered details of injury to the district, such as impaired discipline or control by superiors, conflicts between co-workers or interference with

9. The magistrate judge relied on a third teacher's testimony as well; however, that teacher was never asked about any impact the letter had on the teachers or the school overall. She was only asked about her own reaction to the letter, which was "oh, my gosh." E.R. at 332.

Settlegoode's performance of her duties—factors we generally consider when deciding whether actual injury occurred. *Gilbrook*, 177 F.3d at 867–68. The magistrate judge thus erred when she held that defendants had "prove[d] that plaintiff's speech did significantly disrupt the provision of educational services by the District." *Settlegoode*, CV–00–313–ST, at 33–34.

■ The magistrate judge also erred in concluding that Settlegoode's First Amendment rights were not clearly established. *See id.* at 35. Whether Settlegoode's First Amendment rights were clearly established " 'depends upon the sensitive ad hoc balancing that *Pickering* entails.' " *Brewster v. Bd. of Educ.*, 149 F.3d 971, 980 (9th Cir.1998). We must therefore consider whether, under the governing law, a reasonable jury could have found that " 'the outcome of the *Pickering* balance so clearly favored ... [plaintiff] that it would have been patently unreasonable for the school officials to conclude that the First Amendment did not protect [her] speech.' " *Id.*[10] As we explain above, the jury was more than reasonable in finding that the interests served by allowing Settlegoode to express herself outweighed any minor workplace disruption that resulted from her speech. Furthermore, it is well-settled that a teacher's public employment cannot be conditioned on her refraining from speaking out on school matters. *See Connick*, 461 U.S. at 162, 103 S.Ct. 1684; *Pickering*, 391 U.S. at 572, 88 S.Ct. 1731. It would therefore have been patently unreasonable for Winthrop and Crebo to conclude that Settlegoode's speech was not protected. Winthrop and Crebo were not entitled to qualified immunity from Settlegoode's section 1983 claim.

■ We hold that the magistrate judge's grant of judgment as a matter of law should be reversed with respect to Settlegoode's section 1983 claims against Winthrop and Crebo. Settlegoode is entitled to the full jury award, including the punitive damages assessed against Winthrop and Crebo under section 1983.[11] She is also entitled to attorney's fees under 42 U.S.C. § 1988, which allows a "prevailing party" "reasonable attorney's fees."

*Sanctions*

■ The magistrate judge also granted defendants a new trial because she held that Settlegoode's attorney, Gregory Kafoury, made improper arguments during trial that prejudiced defendants' case. A new trial should only be granted where the " 'flavor of misconduct ... sufficiently permeate[s] an entire proceeding to provide conviction that the jury was influ-

---

10. It is not clear that the jury was instructed on this issue, and it would have been defendants' responsibility to offer such instructions and object if the magistrate judge refused to give them. However, because Settlegoode has not raised this on appeal, the issue is waived. *See Dilley v. Gunn*, 64 F.3d 1365, 1367 (9th Cir.1995).

11. Settlegoode failed to challenge the magistrate's holding that the School Board could not be held liable under section 1983 because Settlegoode did not prove ratification or a pattern and practice, as required by *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *See Settlegoode*, CV–00–313–ST, at 35. Thus, we affirm the district court's grant of judgment as a matter of law with respect to the section 1983 claims against the School Board. However, because we also find the School Board liable under the Rehabilitation Act, *see* note 6 *supra*, it is still liable for compensatory damages. *See Duvall v. County of Kitsap*, 260 F.3d 1124, 1141 (9th Cir.2001) (*Monell* only applies to section 1983 claims, and not to Rehabilitation Act claims, which are governed by respondeat superior); *Bonner v. Lewis*, 857 F.2d 559, 566–67 (9th Cir.1988) (municipalities are not exempted from respondeat superior liability under the Rehabilitation Act).

enced by passion and prejudice in reaching its verdict.'" *Kehr v. Smith Barney*, 736 F.2d 1283, 1286 (9th Cir.1984) (quoting *Standard Oil Co. of California v. Perkins*, 347 F.2d 379, 388 (9th Cir.1965)). There is an even "high[er] threshold" for granting a new trial where, as here, defendants failed to object to the alleged misconduct during trial. *Kaiser Steel Corp. v. Frank Coluccio Constr. Co.*, 785 F.2d 656, 658 (9th Cir.1986). A higher threshold is necessary for two reasons: "First, raising an objection after the closing argument and before the jury begins deliberations 'permit[s] the judge to examine the alleged prejudice and to admonish ... counsel or issue a curative instruction, if warranted.'" *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir.2002) (quoting *Kaiser*, 785 F.2d at 658). Second, "allowing a party to wait to raise the error until after the negative verdict encourages that party to sit silent in the face of claimed error." *Id.* We thus review for plain or fundamental error where no contemporaneous objection was made. Plain error review requires: (1) an error; (2) that the error be plain or obvious; (3) that the error have been prejudicial or affect substantial rights; and (4) that review be necessary to prevent a miscarriage of justice. *Id.*

■ According to the magistrate judge, Kafoury committed misconduct at several points during the trial by ignoring a pretrial order prohibiting evidence as to whether the district's programs for disabled children violated the law. The pretrial order precluded all testimony going to

the merits of the district's programs; "the only permissible evidence was whether plaintiff had been retaliated against for making 'good faith' complaints." *Settlegoode*, CV–00–313–ST, at 45–46. The magistrate judge drew a line here that was not particularly clear. It would have been nearly impossible for Settlegoode to show that she acted in "good faith" because she was not raising baseless allegations, without allowing at least some evidence concerning the school district's programs.[12] We therefore read the magistrate judge's order narrowly and evaluate the specific instances of misconduct cited by the magistrate judge with this conundrum in mind.

The first alleged misconduct came during the examination of Judy Backer, the mother of one of Settlegoode's students. When Settlegoode's counsel called Backer to the stand, defendants objected that Backer's testimony would violate the pretrial order. The court allowed the evidence, so long as it was specifically given "to contradict" Winthrop's testimony that "she ... secured the ramp at Franklin High School," Tr. of Trial at 1434–35 (No. CV 3–00–313–ST) (Nov. 14, 2001), and not to discuss the quality of the special education program. The magistrate judge faulted Kafoury for "ignor[ing] both the court's specific ruling as to Backer and its general rulings excluding program testimony." *Settlegoode*, CV–00–313–ST, at 47. We read the record otherwise.

Kafoury's brief direct examination of Backer focused almost entirely on the

---

12. In fact, the magistrate judge let in considerable evidence going to the quality of the district's programs. For example, the magistrate allowed Settlegoode to testify about the inadequacy of the district's programs and its alleged discriminatory conduct. Settlegoode's letters, which gave detailed descriptions of what she perceived to be violations of federal law, were also admitted into evidence. During cross-examination of Settlegoode, the magistrate judge admitted "the difficulty I find is that there has been so much testimony by the Plaintiff as to the merits of her complaints that there's a lot of room for cross examination." E.R. at 359–60. In addition, Winthrop, Crebo and Matarazzo were all allowed to testify that Settlegoode's complaints were false and inaccurate because this was supposedly part of their motivation for not renewing her contract. *Id.* at 401.

ramp issue, confirming that it was Settlegoode, not Winthrop, who was crucial in obtaining the ramp. While some of Backer's testimony may have "induc[ed] sympathy for a student with a disability," *id.* at 47, none of counsel's questions specifically elicited this testimony. Moreover, though Backer's testimony may have prompted some sympathy for Settlegoode and her efforts, its substance simply did not violate the pretrial order precluding testimony about the program's merit. Backer described her disabled daughter's enjoyment of tennis, and gave Settlegoode credit for making it possible for the child to participate in the sport. We do not see how this testimony bears on whether the school district's programs complied with the law. And while it may have been slightly off-topic from the ramp issue, we are aware of no authority for the proposition that counsel may never call a witness who may elicit sympathy from the jury while also providing relevant testimony. In short, what counsel did with respect to Backer falls well within the realm of vigorous, ethical advocacy.

The magistrate judge also cites as misconduct several of Kafoury's statements in his closing argument, including some that referred to Backer's testimony. The magistrate first criticized Kafoury's comments that, "[Winthrop] took away the tennis program. Broke the heart of this brave little girl suffering from the most cruel of disabilities. Did it just—just out of spite toward my client." *Id.* at 48. Though this argument may evoke sympathy, it also clearly goes to the heart of Settlegoode's retaliation claim. Settlegoode claimed that, not only was she fired, but her superiors first killed some of her programs in retaliation for her letter. This is a plausible argument in light of the record: Winthrop ended the tennis program, claiming it was "glaringly unsafe," E.R. at 378, just after Settlegoode began voicing her criticisms of

Winthrop and the school district. This is surely an acceptable argument to make in a retaliation case. While counsel used graphic terms such as "brave little girl," "most cruel of disabilities" and "spite toward my client" to make his argument, we see nothing wrong with this. A trial lawyer's job, after all, is to present his client's case in the most sympathetic light consistent with the evidence. Using some degree of emotionally charged language during closing argument in a civil case is a well-accepted tactic in American courtrooms. Counsel's argument here came nowhere near stepping over the line.

The magistrate judge also took umbrage at several other statements made during Kafoury's closing argument. These statements included Kafoury's use of the "back of the bus" metaphor taken from Settlegoode's letter, and remarks about how football players and dancers were given priority over special education programs because they are more valuable to the school community. We have held that where "offending remarks occurred principally during opening statement and closing argument, rather than throughout the course of the trial," we are less inclined to find the statements pervaded the trial and thus prejudiced the jury. *Kehr,* 736 F.2d at 1286. In any event, Kafoury's statements were not so inflammatory as to be especially troubling. In *Bird v. Glacier Electric Cooperative, Inc.,* 255 F.3d 1136 (9th Cir.2001), a closing argument rose to the level of misconduct where counsel, speaking to a jury comprised only of Indian tribal members, argued that an Indian-owned cooperative's loss of business was part of a legacy of injustice and colonialism and used colorful language to describe that legacy. Plaintiff's counsel argued: "How can they trust any of their work to the likes of unskilled Indian contractors like these? Certainly the white man's magic is

so much better.... I think you have seen a classic defense to castrating the ... laws on the reservation." *Id.* at 1150. Kafoury, by contrast, was not seeking to inflame racial prejudices or even establish any special interest in the rights of the disabled. His comments referred specifically to the evidence admitted at trial, and he directed his comments to defendants and the situation at hand.

The magistrate judge also criticized Kafoury for mischaracterizing one of defense counsel's statements in his closing argument. Defense counsel had said:

> This case is not about the children, and even if you heard things in this case that bothered you, that you wish Portland Public Schools would do differently, there's nothing that you can do with your verdict today that will change those particular cases or things that you thought should have been different.

*Settlegoode*, CV–00–313–ST, at 51. Kafoury responded: "Defense counsel said this is not about the children. The first thing she said. The second thing she said was, there is nothing you can do. If you don't like what you've heard, we're going to keep doing what we're gonna keep doing, and you can't stop us." *Id.* The magistrate judge held that this was a misrepresentation, when it plainly was not, and that it was inappropriate to urge the jury to "send a message."[13] This case, however, involves a claim for punitive damages. Reminding the jury that they have the capacity to deter defendants and others similarly situated is certainly legitimate where punitive damages are at stake. Indeed, the magistrate judge instructed the jury that "[p]unitive damages may be awarded ... to punish the wrongdoer and to *discourage the Defendant and others* from engaging in wanton misconduct." Tr. of Trial at 1547 (No. CV 3–00–313–ST) (Nov. 15, 2001) (emphasis added). *See also Cooper v. Firestone Tire and Rubber Co.*, 945 F.2d 1103, 1107 (9th Cir.1991) (holding that counsel's actions did not rise to the level of misconduct where his closing argument called for "punishment" and to "make sure ... [defendants] never forget about [the accident]"). A closing argument that tracks the jury instructions cannot possibly be misconduct.

The magistrate judge also held that Kafoury committed misconduct when he claimed defense witness testimony had been scripted and rehearsed by defense counsel. The magistrate judge cited no authority for the proposition that counsel may not assert that an opposing party's witness has been coached, and we're aware of none. Where counsel believes that testimony came out sounding too stilted or polished, we see nothing objectionable in suggesting to the jury that the witness may have been parroting words scripted by someone else. Nor is there anything objectionable about Kafoury's argument that the school district employees had been told to make paper trails to cover their tracks. After all, this kind of thing happens all the time, and there was evidence showing that school district lawyers were involved prior to Settlegoode's termi-

---

13. The magistrate judge also disapproved of another portion of Kafoury's closing argument, which also urged the jury to "send a message" to the district. Kafoury argued:
   And the question is whether you want to use this opportunity not just to do justice in this case, which sorely needs some justice, but whether you want to use this opportunity to give some power, some breathing room to those who want to make things better, to those who want to be advocates for kids, or whether you want to strengthen the dead hand of this bureaucracy whose face you've seen.
   *Settlegoode*, No. CV–00–313–ST, at 52–53. For the reasons explained in text, we believe this statement was proper.

nation. That Kafoury had no direct evidence supporting these arguments is of little consequence; circumstantial evidence and inference are sufficient to support a legitimate argument. Kafoury is not a prosecutor, subject to "constraints and responsibilities that don't apply to other lawyers." *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir.1993). As an advocate in a civil lawsuit, he was perfectly entitled to argue that the jury should disbelieve the opposing party's witnesses for any number of reasons, including that they may have been guided by advice of their lawyers. The sanction for making such an argument is that it may boomerang if it does not resonate with the jury.[14]

▮ The magistrate judge found that, taken together, the various instances of misconduct were sufficiently prejudicial to defendants' case as to merit a new trial. Even if we were to find that any misconduct occurred—and we have identified none—Kafoury's conduct at trial could not have possibly affected defendants' substantial rights. Even in cases where the trial court has found counsel's behavior is "outrageous," we've found no prejudice. *See Kehr*, 736 F.2d at 1285. Given that most of counsel's statements were limited to his closing argument, which was well within the bounds of fair advocacy, and there was more than sufficient evidence for the jury to find in Settlegoode's favor, we hold that the magistrate judge abused her discretion in ordering a new trial.

### Conclusion

We reverse the district court's judgment and remand with instructions that the court enter judgment for plaintiff consistent with the verdict, plus post-judgment interest and attorney's fees pursuant to 42 U.S.C. § 1988. We refer the case to the Appellate Commissioner for a determination of Settlegoode's attorney's fees on appeal.

**REVERSED.**

---

**14.** The magistrate judge cited several other instances of alleged misconduct. For example, the magistrate pointed to the fact that Kafoury "twice told the jury that the length of testimony in plaintiff's deposition and arbitration was 1,400 pages" when really it was just under 300 pages. *Settlegoode*, CV–00–313–ST, at 62. The magistrate also claimed Kafoury improperly tried twice to ask Settlegoode's doctor whether he agreed with defendant's expert witness that scientific evidence is not sufficient to prove stress causes Graves' Disease, one of the ailments that Settlegoode complained of, even though the court had previously ruled the doctor could not testify as a medical expert. The magistrate judge sustained objections to these questions, and removed damages stemming from Graves' Disease from consideration of the jury, but nevertheless held that Kafoury's questions amounted to misconduct. Finally, the magistrate judge held that Kafoury improperly tried to impeach the high school principal by criticizing her performance as principal. Defendants objected and the objection was sustained. We cannot see how any of this conduct, individually or taken together, amounts to misconduct worthy of the magistrate's attention.